IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Janice Lauree Watkins,       ) | Civil Action No. 6:11-967-TLW-KFM |
|       Plaintiff,   ) | |
|       ) | **REPORT OF MAGISTRATE JUDGE** |
|    vs.       ) | |
|       ) | |
| Michael J. Astrue,       ) | |
| Commissioner of Social Security,   ) | |
|       ) | |
|       Defendant.   ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. § 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on September 29, 2006, alleging that she became unable to work on July 17, 2005. The application was denied initially and on reconsideration by the Social Security Administration. On May 24, 2007, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Thomas C. Neil, Ph.D., an impartial vocational expert, appeared on May 12, 2009, considered the case *de novo*, and on June 4, 2009, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on February 18, 2011. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.
>
> 2. The claimant has not engaged in substantial gainful activity since July 17, 2005, the alleged onset date (20 C.F.R. § 404.1571 *et seq.*)
>
> 3. The claimant has the following severe impairments: degenerative disc disease of the cervical and lumbar spine and status post three cervical fusions (20 C.F.R. § 404.1520(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform work as defined in 20 C.F.R. 404.1567(a) except no lifting or carrying over 10 pounds occasionally and less that 10 pounds frequently; no more than occasional stooping, balancing, crouching, kneeling, or climbing of stairs or ramps; and no crawling or climbing of ladders, ropes, or scaffolds.
>
> 6. The claimant is capable of performing past relevant work as a data entry clerk and as a receptionist. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from July 17, 2005, through the date of this decision (20 C.F.R. § 404.1520(f))

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1)  is engaged in substantial gainful activity, (2)  has a severe impairment, (3)  has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4)  has an impairment that prevents past relevant work, and (5)  has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).  He

must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 52 years old on her alleged disability onset date and 56 years old when the ALJ rendered his decision (Tr. 116). She completed high school and one year of college and worked in the past as a general clerk, data entry clerk, and receptionist (Tr. 35, 131). In July 2005, the plaintiff stopped working at her job of 15 years because she was laid off (Tr. 35, 139, 253). After being laid off, she applied for and received unemployment benefits (Tr. 35-36). As part of her application, the plaintiff claimed she could not work due to physical impairments involving her neck and back and mental impairments such as anxiety, depression, and affective mood disorders. (Tr. 69, 139, 181).

The plaintiff's medical records show that she had a history of neck surgeries, hand surgery, and hysterectomy dating back to 1993, 1996, and 1998 (Tr. 202, 206, 364). In June 2005, one month before the plaintiff alleged she became disabled, Li Huang, M.D., of Integrated Health Center, performed a consultative examination concerning the plaintiff's complaints of neck, back, and left arm problems. The plaintiff noted that some of her symptoms and functional limitations had existed for over ten years. Based on diagnostic and examination findings, Dr. Huang diagnosed the plaintiff with "chronic degenerative joint disease of her cervical spine and chronic cervical disc syndrome with left arm hand neuritis" (Tr. 202). Dr. Huang did not prescribe any treatment but instructed the plaintiff to return for follow-up care.

The plaintiff did not return to Dr. Huang. Instead, in September 2005, she saw Gerhard K. Kraske, M.D., at Internal Medicine Associates, her primary care physician, who referred her to Gregory M. Oetting, M.D., a neurologist with Neurological Associates of Augusta (Tr. 218-19). On November 1, 2005, Dr. Oetting saw the plaintiff for pain, particularly in extension. She was unable to extend to the right side. Dr. Oetting wrote that she was status post C4 to C7 cervical fusion, C3-4 probable instability problem occurring with the cervical spondylitic change and evidence of mild myelopathy based on examination (Tr.

5

235). On November 29, 2005, Dr. Oetting reported that the plaintiff had evidence of a cervical instability problem at the C7-T1 level and 4-5 mm of spondylolisthesis at C7-T1 level. He wrote that there was also suggestion of a fairly good sized ventral spur at the level where she had the spondylolisthesis and there was evidence of some stenosis, particularly lateral recess stenosis (Tr. 234, 238-239). On December 29, 2005, Dr. Oetting recommended to either continue with the medication and pain management process, which he indicated was a poor option considering there was an instability problem, or opt for C3 to C7 posterior cervical laminectomy, C3-T1 posterior cervical instrumentation and fusion with Axon fixation. Dr. Oetting indicated that surgery would not make her perfect and pain free, but would hopefully improve her by 70% (Tr. 233).

On January 27, 2006, the plaintiff underwent neck surgery (Tr. 229, 305-06). On February 28, 2006, the plaintiff reported a 40-50% improvement. The shoulder pain was better, but she still had a fair amount of neck pain. The radiology report demonstrated that the screws and rods were in good position. Consolidation could not be seen at that point. Her motor strength was 5/5 (Tr. 232). The plaintiff saw Dr. Oetting on April 18, 2006, three months post-surgery. She reported 0% improvement with prominent arm pain that was evident. Dr. Oetting recommended conditioning and therapy. Dr. Oetting thought there was an issue of depression (Tr. 231). A radiology report showed no acute abnormality and no complication (Tr. 236). On July 18, 2006, the plaintiff returned to see Dr. Oetting. She described 50% improvement. She was attending physical therapy. Dr. Oetting reported that he thought she could return to work, but suggested that she limit herself to light duty considering all of the surgeries she has had performed on her neck. He thought that a 30 pound light duty weight limit, a permanent restriction, was probably appropriate. He suggested that she continue her exercises and avoid lifting (Tr. 230).

On October 17, 2006, the plaintiff returned to Dr. Oetting. The plaintiff said her pain had not improved post-surgery, despite taking pain medication prescribed by Dr. Kraske (Tr. 229). A radiology report indicated status post bony fusion of C3 through C6, vertical rods extending from C3 through C7 and forward subluxation of C2 over C3, slightly more pronounced on the flexion view than on previous studies (Tr. 244). On October 24, 2006, an MRI indicated that here was no recurrent disc, there were post-op changes noted in C4-5, C5-6 and C6-7, and there was small leftward osteophyte at C5-6 (Tr. 399). Dr. Oetting referred the plaintiff to John Downey, Sr., D.O., a pain management specialist at Augusta Pain Management, who administered a series of steroid injections (Tr. 229, 252-53, 247-51).

On November 2, 2006, the plaintiff returned to Dr. Oetting (Tr. 242). The plaintiff reported 0% improvement. Dr. Oetting noted that flexion x-rays showed the plaintiff had some mild instability at the C2-3 level, but nothing that was over and above the usual, and that an MRI of the cervical spine "looks good" (Tr. 242; *see* Tr. 244-45). He concluded that "there is an overlying issue her of chronic depression." Dr. Oetting recommended a functional capacity evaluation to determine what work the plaintiff could perform (Tr. 242).

In December 2006, Richard Weymouth, M.D., a State agency physician, reviewed the record and found that the plaintiff could perform work at the light exertional level (Tr. 258-65). Dr. Weymouth specifically found that the plaintiff had no manipulative limitations (Tr. 261). That month, Dr. Downey ordered additional diagnostic tests, which revealed no evidence of carpal tunnel syndrome or ulnar neuropathy, but evidence of cervical radiculopathy and nerve root irritation (Tr. 335-36). Dr. Downey continued to provide pain management, including steroid injections (Tr. 322-33).

On December 6, 2006, Dr. Kraske completed a short fill-in-the-blank form concerning the plaintiff's mental health. Dr. Kraske listed the plaintiff's mental diagnoses as depression and anxiety; noted her medication helped her condition; and that psychiatric care was not recommended. Dr. Kraske also noted mostly normal mental status examination

7

findings. Specifically, the plaintiff had intact and appropriate thoughts; adequate attention, concentration, and memory; and a worried/anxious mood/affect. Finally, Dr. Kraske indicated that the plaintiff had "mild" to "moderate" mental work-related functional limitations (Tr. 257).

On December 21, 2006, Manhal Wieland, Ph.D., a State agency psychologist, reviewed the record and found that the plaintiff's mental impairments were not "severe" as defined by the Act (Tr. 266-79). Dr. Wieland specifically found that the plaintiff was mildly limited in general areas of functioning. (Tr. 276).

On April 3, 2007, five months after her last visit, the plaintiff returned to Dr. Oetting with complaints of severe lower extremity pain. Dr. Oetting noted that recent lumbar diagnostic tests revealed significant degenerative changes and a slight disc bulge, but no large disc herniation or significant compressed tissue (Tr. 285, 392-93). An examination also revealed "slightly" positive straight leg raising, but symmetrical reflexes, intact motor strength, and good hip range of motion (Tr. 393). Dr. Oetting ordered additional tests, which he noted showed the plaintiff's lumbar spine was "essentially normal" with no structural defects or evidence of nerve root impingement, and her cervical spine was "well decompressed all the way through" (Tr. 392, 396-98). Dr. Oetting recommended that the plaintiff continue to see Dr. Cable for epidural injections and then consider discography at 2-3, pending the results of the injections. He also sent the plaintiff to see John Dirksen for a psychiatric evaluation with regard to chronic depression (Tr. 392).

In May 2007, Edward L. Stahl, Jr., M.D., a State agency physician, reviewed the record and concurred with Dr. Weymouth's assessment that the plaintiff could perform work at the light exertional level, including no manipulative limitations (Tr. 340-47).

Between May and July 2007, based on Dr. Oetting's referral, the plaintiff saw Todd D. Cable, M.D., a neurologist at Augusta Back, for pain management concerning her lower extremities (Tr. 385-91). Dr. Cable's examination on May 3, 2007, revealed some abnormalities, including diminished cervical range of motion, but also good lumbar range of

8

motion, normal motor function, and intact sensation (Tr. 387, 390). Dr. Cable recommended several treatment options, including lumbar epidural injections and pain medication. Dr. Cable also recommended deep muscle stimulation for her neck and shoulder pain as well as neuropathic pain medicines, but the plaintiff declined and continued with her current medical management under the care of her new treating doctor, James L. Bland, M.D.[2] (Tr. 391). Dr. Cable gave the plaintiff repeat epidural steroid injections. She was also prescribed Topamax (Tr. 387-88). On July 2, 2007, the plaintiff reported that she experienced resolution of her pain following each of the injections, but on the most recent injection she had improvement for only a two day period with a quick return to pre-existing levels. She discontinued the Topamax due to side effects. The plaintiff also reported a new complaint of memory loss. Dr. Cable referred her to Dr. Hughes, a neurologist. Dr. Cable noted that the plaintiff appeared depressed and was tearful. Dr. Cable suggested a repeat trial of Neurontin and psychiatric assistance for her depression (Tr. 385-86).

In August 2007, based on a referral from Dr. Bland, Ildemaro J. Volcan, M.D., performed a consultative examination regarding the plaintiff's complaints of lower extremity pain emanating from her hips. Dr. Volcan noted recent right hip diagnostic tests were normal (Tr. 406-07, 420-23). An examination revealed decreased reflexes indicative of spinal cord compression and spinal muscle spasms, but also normal motor strength and lower extremity range of motion, and no atrophy or muscle twitching (neurological signs). Dr. Volcan recommended an orthopedic evaluation to determine if the source of the plaintiff's pain was unrelated to her spine. Dr. Volcan noted that the plaintiff's recent and remote memory were within normal limits (Tr. 406-07). Later that month, Paul J. Herzwurm, M.D., an orthopaedist with Orthopaedic Associates of Augusta, reviewed diagnostic tests of the plaintiff's hip and

---

[2]In March 2007, the plaintiff established care with Dr. Bland. As noted by the Commissioner, many of Dr. Bland's treatment notes are hand-written, difficult to read, and primarily reflect the plaintiff's subjective complaints and prescribed medications instead of clinical findings (Tr. 339, 445-58, 579, 581).

performed an examination, but could not determine the origin of the plaintiff's right hip pain (Tr. 423).

On December 3, 2007, the plaintiff returned to Dr. Cable, complaining primarily of lower extremity pain. Dr. Cable noted that recent diagnostic tests (EMG) of her right lower extremity were normal, and he could find no clear source of her radicular symptoms. On examination, the plaintiff's gait was within normal limits, her lower extremities reflexes were intact; but she had poor posture and cervical range of motion. Dr. Cable adjusted her medications and ordered additional lumbar spine diagnostic tests, which showed a stable disc bulge. Dr. Cable noted that Dr. Hughes, a neurologist, performed diagnostic tests, found no evidence of cognitive slowing, but was concerned about depression. Dr. Cable offered to schedule a formal psychiatric evaluation and manipulation of her anti-depressant medication, but the plaintiff declined (Tr. 431-32, 435).

On May 14, 2008, five months after her last visit, the plaintiff returned to Dr. Cable. The plaintiff complained of hip-related pain and said she had no other complaints. Examination revealed some hip tenderness, decreased lumbar range of motion but no significant pain, intact lower extremity strength and sensation, and a normal gait. Dr. Cable discussed treatment options. The plaintiff agreed to medication, but declined injections (Tr. 439).

On June 25, 2008, the plaintiff told Dr. Cable her back and legs were not bothering her as much and she had "no real lower extremity weakness." The plaintiff now reported upper extremity weakness, including arm pain, tiredness, and inability to reach overhead, similar to her pre-surgery symptoms. Examination findings showed the plaintiff "maybe [had] some slight upper extremity weakness" on the left compared to her right; "maybe a little bit of grip weakness"; and a negative Hoffman (indicator of spinal cord compression). The plaintiff's lower extremity strength and sensation and gait remained intact. Dr. Cable referred the plaintiff to Dr. Oetting for further evaluation of her neck (Tr. 440-41).

10

On July 3, 2008, Dr. Oetting noted that diagnostic tests of the plaintiff's spine showed some changes in her thoracic spine, but no cord or nerve root compression, and her lumbar spine remained the same. The plaintiff told Dr. Oetting her pain was not life controlling. The plaintiff opted to continue pain management instead of further evaluative testing. Dr. Oetting instructed the plaintiff to return in 6 to 12 months (Tr. 442).

During the remainder of 2008, the plaintiff returned to Dr. Bland to recheck and adjust her medications (Tr. 445-54, 572, 576-77). In October 2008, the plaintiff reported putting down sod (Tr. 584). In November 2008, the plaintiff told one of her providers her pain was "doing better" (Tr. 573).

In 2009, the plaintiff continued to see Dr. Bland for medication management (Tr. 579, 581). In February 2009, the plaintiff was referred to Khaled F. Kamel, M.D., a neurologist, concerning complaints of headaches. Dr. Kamel's examination revealed strong ability to shoulder shrug and head turn; normal strength; normal gait and coordination, including rapid alternating movements and ability to heel/toe/tandem walk; and intact sensation. Dr. Kamel deferred to Dr. Oetting for treatment of the plaintiff's neck pain and did not change the plaintiff back pain treatment (Tr. 584-85).

*Hearing testimony*

The plaintiff testified she was unable to work due to neck, head, back, and arm pain (Tr. 36-38, 40). She also had depression, which she claimed caused crying spells and memory issues. With anti-depressant medication, she cried less frequently, *i.e.*, once or twice a week instead of all the time (Tr. 38-39, 43, 54). She had not sought any psychiatric care in 20 years (Tr. 53-54). She claimed her ability to perform exertional activities was extremely limited, particularly with her upper extremities, and she spent most of her day sitting (Tr. 40-42, 50-52). According to the plaintiff, she cooked, performed some household chores, managed her personal care independently, grocery shopped, and attended church (Tr. 32-35).

11

Thomas C. Neil, Ph.D., a vocational expert, provided vocational expert testimony.  As defined in the Dictionary of Occupational Titles ("DOT"), Dr. Neil identified the plaintiff's past work as the semi-skilled, light work of a general clerk (DOT # 209.562-010), semi-skilled, sedentary work of a data entry clerk (DOT # 203.582-054), and the semi-skilled, sedentary work of a receptionist (DOT # 237.367-038) (Tr. 58-59)[3].  Dr. Neil was asked to consider an individual with the plaintiff's age, education, work history, and who had the residual functional capacity to perform work at the sedentary exertional level with additional limitations.  Specifically, the individual could lift and carry up to ten pounds occasionally and less than ten pounds frequently; stoop, balance, crouch, kneel, climb stairs or ramps occasionally; but not crawl or climb ladders, ropes or scaffolds (Tr. 60).  In response, Dr. Neil testified that such an individual could perform the plaintiff's past relevant work as a receptionist and data entry clerk as generally performed in the national economy, but not her work as a general clerk (Tr. 61).

## ANALYSIS

The plaintiff was 52 years old on her alleged disability onset date and was 56 years old as of the date of the ALJ's decision.  The ALJ found that she had the following severe impairments:  degenerative disc disease of the cervical and lumbar spine and status post three cervical fusions.  He further determined that the plaintiff had the residual functional capacity ("RFC") to perform a reduced range sedentary work.  The ALJ determined the plaintiff could perform her past relevant work as a data entry clerk and receptionist.  The plaintiff argues that the ALJ erred by (1)  failing to properly explain his findings regarding her RFC, including her manipulative limitations; (2)  failing to properly explain why she was found to have no meaningful mental impairments; (3)  failing to properly evaluate whether her

---

[3]  See DICOT 209.562-010, 1991 WL 671792 (general clerk); DICOT 237.367-038, 1991 WL 672192 (receptionist); DICOT 203.582-054, 1991 WL 671700 (data entry clerk).

cervical condition meets and/or equals the criteria of Listing 1.04; and, (4) failing to properly evaluate her credibility.

### Mental Impairments

The plaintiff first argues that the ALJ erred in finding that she had no severe mental impairments. The regulations establish a "special technique" that must be followed when evaluating mental impairments. *See* 20 C.F.R. § 404.1520a. At the administrative hearing level, the regulations do not require a formalistic application of the technique. *See id.* § 404.1520a(e) (the ALJ is not required to complete the standard form, used at the initial and reconsideration levels of the administrative process, to document how he applied the technique). Instead, the ALJ must "incorporate the pertinent findings and conclusions based on the technique" in his decision. *See id.* § 404.1520a(e)(4).

Here, as argued by the Commissioner, the ALJ analysis comported with the agency's regulations. The ALJ found that the plaintiff's mental impairments—anxiety and depression—were not "severe" impairments within the meaning of the Act because they did not cause more than minimal limitations in her ability to perform basic mental work-related activities (Tr. 17). *See id.* § 404.1521(b) (defining basic work activities). The ALJ specifically found that the plaintiff had only "mild" limitations in the broad functional areas identified in the regulations: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation (Tr. 17). *See id.* § 404.1520a(c)(3). As noted by the Commissioner, the ALJ's severity analysis was consistent with that of Dr. Wieland, a State agency psychologist, who reviewed the record and found that the plaintiff's mental impairments were not "severe" (Tr. 266-79). *See id.* § 404.1527(e)(2)(i); SSR 96-6p, 1996 WL 374180, at *2 (1996) (opinions of state agency medical consultants must be considered and weighed as those of highly qualified experts).

The ALJ specifically discussed the plaintiff's treatment for depression and anxiety from various medical providers (Tr. 14-17). For instance, the ALJ noted Dr. Kraske's

December 2006 opinion that the plaintiff had mild to moderate mental work-related functional limitations (Tr. 14, 257). The ALJ also noted Dr. Cable's 2007 opinion that the plaintiff had a significant degree of depression and his subsequent recommendation that she seek psychiatric help (Tr. 16, 385, 391, 431). The ALJ also noted that Dr. Brand's prescribed anti-depressant medication (Xanax) (Tr. 15-16, 445-58, 572, 576-77). The ALJ noted that, despite Dr. Kraske's opinion of "mild" to "moderate" mental functional limitations, Dr. Kraske specifically found the plaintiff had intact and appropriate thoughts and adequate attention, concentration, and memory. He further stated that prescribed medications had helped her condition and that no psychiatric care had been recommended (Tr. 14, 257). The ALJ also noted that other treatment records revealed normal mental status examination findings (Tr. 16). For instance, in August 2007, the plaintiff's recent and remote memory were within normal limits (Tr. 406). Additionally, in September 2009, the plaintiff had a normal and positive affect and was in no acute distress (Tr. 16, 540). Significantly, while Drs. Bland, Oetting, and Cable noted the plaintiff had issues with depression, they did not document supporting mental status examination findings (*see* Tr. 217-21, 339, 385-86, 391-92, 431, 445-58, 572, 576-77, 579, 581).

As argued by the Commissioner, it was the ALJ's responsibility to weigh the evidence. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Where, as here, the medical evidence was devoid of objective clinical findings that suggested specific mental functional limitations were warranted, the ALJ could reasonably conclude that the plaintiff's mental impairments were controlled with medication and thus were, not "severe" within the meaning of the Act. *See* 20 C.F.R. § 404.1529(c)(2) (objective medical evidence is a useful indicator to assist in making reasonable conclusions concerning the impact of symptoms on a claimant's ability to work); *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled with medication or treatment, it is not disabling"). Based upon the foregoing, the court finds the ALJ did not err in this regard.

14

*Listing Analysis*

The plaintiff next argues that the ALJ erred in failing to properly evaluate whether her cervical condition meets and/or equals Listing 1.04(A). The regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. § 404.1520(d). A listing analysis includes identifying the relevant listed impairments and comparing the criteria with the evidence of the plaintiff's symptoms. See *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (stating that "[w]ithout such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination"); *Beckman v. Apfel*, C.A. No. WMN-99-3696, 2000 WL 1916316, *9 (D. Md. 2000) (finding that where there is "ample factual support in the record" for a particular listing, the ALJ should perform a listing analysis).

Listing 1.04(A) provides as follows:

> ***Disorders of the spine*** (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> ***

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04.

In his analysis, the ALJ found:

> [T]he claimant's degenerative disc disease had not resulted in limitations because of distortion of the bony and ligamentous architecture of the spine and associated impingement on the nerve roots or spinal cord, resulting in an inability to ambulate effectively, as required to meet Section 1.04 of the Listing of Impairments.

(Tr. 18).

The plaintiff argues that the ALJ erred in finding that she did not meet the listing. However, as the ALJ found, the plaintiff's spinal disorder was not of listing-level severity because it did not involve nerve root compression (Tr. 17-18). As part of his discussion of the relevant evidence, the ALJ discussed 2006, 2007, and 2008 diagnostic tests that repeatedly showed no evidence of nerve root compression (Tr. 15-16). Specifically, the ALJ noted 2006 MRI scans of the plaintiff's cervical spine and Dr. Oetting's interpretation of the results, which did not detect any specific compression of any nerve roots (Tr. 15, 242, 244-45). The ALJ also cited Dr. Oetting's 2007 diagnostic tests that revealed a non-compressive disc bulge (Tr. 15, 392, 396-98). Finally, the ALJ cited Dr. Oetting's 2008 diagnostic tests, which revealed no cord or nerve root compression (Tr. 16, 442).

The plaintiff further argues that the ALJ's description of the listing was inaccurate. It appears the ALJ quoted partially from the introductory section to the listing, which states in pertinent part, "Disorders of the spine, listed in 1.04, result in limitations because of distortion of the bony and ligamentous architecture of the spine and associated impingement on nerve roots (including the cauda equina) or spinal cord." 20 C.F.R. Pt. 404, Subpt. P., App. 1, 1.00(K). As argued by the Commissioner, any error with regard to the ALJ's description of the listing criteria is harmless as the ALJ reasonably concluded that the plaintiff's spinal disorder did not involve nerve root compression, which is a requirement of Listing 1.04.

### Residual Functional Capacity

Lastly, the plaintiff argues that the ALJ erred in the RFC determination. The ALJ determined that the plaintiff had the RFC to perform a reduced range of work at the sedentary exertional level. The ALJ further found that while the plaintiff's impairments could reasonably be expected to cause some of the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of the symptoms were not fully credible (Tr. 19). The plaintiff argues that the ALJ "failed to explain why the extensive medical evidence

submitted failed to support any specific restrictions in terms of reaching, handling (gross dexterity), or fingering (fine dexterity)" (pl. brief at 24).  The plaintiff further argues that the ALJ erred by not finding her subjective complaints fully credible.

Social Security Ruling 96-8p, 1996 WL 374184, provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted).  Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process.  First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . .  It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence.

20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4.  Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

In support of his findings, the ALJ noted the "lack of reports from any treating source that [the plaintiff's] impairments [were] actually debilitating to the point of precluding substantial gainful activity" (Tr. 19).  The ALJ further noted that Dr. Oetting, the plaintiff's

treating neurologist, opined that she could perform light duty work with a 30-pound permanent weight limit restriction (Tr. 14, 16 230). Dr. Oetting did not recommend any manipulative limitations (Tr. 230). Likewise, the ALJ cited the opinions of Drs. Weymouth and Stahl, recognized experts in Social Security disability evaluation, who found that the plaintiff could perform light work and did not recommend manipulative limitations (Tr. 20, 258-65, 340-47).

Further, the evidence showed that six months after her neck surgery, in July 2006, the plaintiff told Dr. Oetting her neck and shoulder pain had resolved (Tr. 14, 230). Three months later, in October 2006, the plaintiff renewed her complaints, but Dr. Oetting concluded surgery was not warranted and recommended a functional capacity evaluation (Tr. 15, 229, 242). Additionally, in 2007, the plaintiff sought treatment from several specialists, including Drs. Oetting, Cable, Volcan, and Herzwurm, for problems with her lower extremity—not upper extremity (Tr. 392-93, 385-91, 406-07, 431-32, 439). Although physical examination findings revealed some limitations in her neck movement (Tr. 387, 390, 431), they also showed intact motor strength and sensation (Tr. 387, 390, 393, 406). Furthermore, the evidence showed that the plaintiff declined treatment for her neck and shoulder pain (Tr. 391). In 2008, the plaintiff initially reported she had "no other complaints," besides lumbar/hip problems (Tr. 439).

It was not until June 2008 that the plaintiff reported upper extremity problems (Tr. 440). At that time, however, Dr. Cable's examination findings revealed the plaintiff "maybe [had] some slight upper extremity weakness" on the left compared to her right; "maybe a little bit of grip weakness"; and a negative Hoffman (indicator of spinal cord compression) (Tr. 440). In July 2008, the plaintiff then told Dr. Oetting that her neck pain was not "life controlling," and she declined further evaluative testing in lieu of continued pain management (Tr. 442). Additionally, as the ALJ noted, in September 2008, an examination of the plaintiff's head and neck was normal, with no erythema, swelling, or tenderness, and

there was no misalignment, tenderness, or masses of the upper extremities (Tr. 16, 541). In 2009, the plaintiff sought treatment for headaches—not upper extremity problems (Tr. 585). As the ALJ noted, Dr. Kamel, a neurologist, performed an examination that revealed the plaintiff had a strong ability to shoulder shrug and head turn; normal strength; and intact sensation (Tr. 17, 19, 585). As argued by the Commissioner, the medical evidence shows that any limitations in the plaintiff's upper extremities did not persist for at least 12 consecutive months at the level of severity the plaintiff claimed.

The ALJ also relied on other factors to support his credibility analysis and RFC finding. The ALJ noted that the plaintiff worked for over ten years with "severe chronic, constant pain and spasms with decreased range of motion of the cervical and upper thoracic spine" – essentially the same types of upper extremities' symptoms and limitations she now claimed were disabling (Tr. 13, 202). As the ALJ noted, the plaintiff testified that she stopped working because she was laid off—not because of her impairments (Tr. 18, 35, 139, 253). The ALJ's finding that the plaintiff was not as functionally limited as she claimed was also bolstered by the fact that the plaintiff testified she was receiving unemployment benefits, which implied that she was willing and able to work at the time she alleged disability (Tr. 19, 35-36). *Elder v. Astrue*, No. 3:09-2365-JRM, 2010 WL 3980105, at * 10 (D.S.C. 2010) (ALJ's credibility finding supported in part by evidence that plaintiff applied for unemployment benefits). The ALJ also gave some "slight" weight to his observation that the plaintiff had no difficulty participating in the administrative hearing (Tr. 19). The ALJ expressly noted that his observation was not a "conclusive" indicator of the plaintiff's overall level of pain and functioning (Tr. 19). Under these circumstances, and contrary to the plaintiff's assertion (pl. brief at 37-39), the ALJ's reliance on his hearing observations was legally valid. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984) (ALJ's observations of claimant properly considered in evaluating credibility).

Based upon the foregoing, this court finds that the ALJ's credibility analysis and RFC finding were without legal error and supported by substantial evidence.

## **CONCLUSION AND RECOMMENDATION**

This court finds that the Commissioner's decision is supported by substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

July 10, 2012
Greenville, South Carolina